UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK       FOR ONLINE PUBLICATION ONLY
----------------------------------------------------------------X
ZHONG KUN DING, M.D.,                     :
                                          :
                     Plaintiff,           :
                                          :   MEMORANDUM
         - against -                      :   AND ORDER
                                          :
                                          :   03 CV 1237
AUDREA BENDO, M.D., Director, Residency   :
Program, Vice-Chair for Education,        :
JAMES COTRELL, M.D., Chair, Anesthesiology :
Department, Senior Associate Dean for Clinical :
Practice, College of Medicine, JOSEPH GIFFIN, :
M.D., Executive Vice-Chair of Anesthesiology :
Department, DAVID WLODY, M.D., Vice-Chair, :
Anesthesia Department, Co-Chair, Clinical :
Competence Committee, [in their individual :
capacities and in their official capacities], :
SUNY DOWNSTATE MEDICAL CENTER,            :
                                          :
                     Defendants.          :
----------------------------------------------------------------X

A P P E A R A N C E S :

     ZHONG KUN DING, M.D.
         148-15 25th Drive
         Apartment #1F
         Flushing, New York  11354
         Plaintiff *Pro se*

     ELIOT SPITZER
         Attorney General of the State of New York
         120 Broadway, 24th Floor
         New York, New York  10271
     By:   Antoinette W. Blanchette
         Assistant Attorney General
         Attorney for Defendants

JOHN GLEESON, United States District Judge:

       Dr. Zhong Kun Ding, an American citizen of Chinese national origin, filed this

action after he was terminated from the anesthesiology residency program at the State University

of New York ("SUNY") Downstate Medical Center ("Downstate"). In his third amended complaint, Dr. Ding alleges his discharge and other adverse treatment was motivated by the defendants' animus against persons of Chinese origin in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment and seeks damages pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 2000e, et seq. (Title VII). Dr. Ding also asserts claims under New York law for *prima facie* tort, intentional infliction of emotional distress, breach of contract, tortious interference with contract, and tortious interference with prospective business relationships.

The defendants have moved for summary judgment on all of these claims. I heard oral argument on the motion on March 17, 2006. For the reasons set forth below, the defendants' motion for summary judgment is granted with respect to all but two of Dr. Ding's claims. The remaining claims, which arise under state law, are dismissed without prejudice, as I decline to exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367(c).

## BACKGROUND

After earning his medical degree in China, Dr. Ding came to the United States for his residency training in anesthesiology. In order to obtain certification from the American Board of Anesthesiologists ("ABA"), a medical graduate must complete a four-year program consisting of a "clinical base year," or intern year, and three years of clinical anesthesiology training, referred to as CA-1 through CA-3. Dr. Ding completed his intern year at West Virginia University and his CA-1 year at New York University ("NYU"). The clinical competence committee ("CCC") at NYU noted that Dr. Ding had "received a satisfactory evaluation for the CA1 year ... although the members felt that he had some difficulty integrating clinical skills and knowledge in the care of patients." Def. Ex. 16.

Although it is not entirely clear from the record why he left NYU, Dr. Ding applied for a position in the SUNY Downstate Medical Center clinical anesthesia residency program in the Spring of 1999, hoping to finish the remaining two years of his residency there. Dr. Ding interviewed with several faculty members, including two defendants in this action, Drs. Audrea Bendo and David Wlody, and thereafter the resident selection committee unanimously recommended that he be offered a position at the CA-2 level. The Chair of the Department, defendant Dr. James Cotrell, agreed and offered Dr. Ding a job by a "Letter of Intent," noting that the offer was "with the condition that you understand that by the completion of your CA-2 year you will function at the level with your peers. " Def. Ex. 17. Dr. Ding accepted.

The residents at Downstate receive frequent evaluations of their performance from the attending physicians, and during the 1999-2000 academic year, Dr. Ding received many evaluations that were satisfactory. He received several unsatisfactory evaluations, however, along with a complaint filed by a patient. At the end of his first six months at Downstate, the CCC rated his overall clinical competence as unsatisfactory, explaining that Dr. Ding's "anesthetic management skills [were] not appropriate for his level of training" and that he was "unable to function independently." Def. Ex. 23. Dr. Ding was then temporarily removed from handling CA-2 level patient care cases. After a set of more unsatisfactory reviews, Dr. Ding again received an overall clinical competence rating of unsatisfactory for his second six-month period at Downstate. Def. Ex. 33. As a result, and pursuant to ABA regulations, the CCC recommended that Dr. Ding not be matriculated to the CA-3 level, and Dr. Cotrell agreed. *See* Def. Ex. 12, ABA Booklet of Information § 2.02(c). Further, in a meeting with Dr. Ding on May 11, 2000, Dr. Bendo informed Dr. Ding that although "residents are [normally] given a three year

3

letter of intent, stating the full length of the residency program .... [Dr. Ding] was only given a one-year contract and Letter of Intent because of problems he had at NYU." Bendo Aff. ¶ 21. Dr. Ding was accordingly advised that his contract would not be renewed for the 2000-01 academic year.

Dr. Ding appealed this decision, along with the decisions to give him unsatisfactory evaluations for his first two six-month periods at Downstate, to the Graduate to Medical Education Committee ("GMEC"), which recommended by letter of July 25, 2000 that the "anesthesiology residency program's decision to terminate you as a resident be rescinded .... because the ... program's 'letter of intent' ... did not make it sufficiently clear that [Dr. Ding's] appointment was a 'conditional one year agreement.'" Def. Ex. 43. Accordingly, the GMEC recommended that Dr Ding "be reappointed as a resident for 2000-2001 and that if the program intends to make the appointment conditional or probationary that this be clearly stated in writing in your resident contract." Def. Ex. 43. By a second letter of August 17, 2000, after review of Dr. Ding's full academic file and the supporting documentation he submitted, the GMEC advised Dr. Ding it "found [that] the Program's decision to not grant [him] [ABA] credit [was] fully supported and documented in the record of [his] evaluations by the faculty." Def. Ex. 45.

Notably, throughout this appeals process, Dr. Ding did not claim that any of his unsatisfactory evaluations were motivated by an animus against persons of Chinese national origin.

In accordance with the GMEC's recommendations, by letter of August 21, 2000, the residency program reinstated Dr. Ding, again at the CA-2 level, this time making clear that his appointment was for a provisional term of one year, with renewal conditioned upon his

4

satisfactory progress. Def. Ex. 47. Dr. Ding again accepted.

Soon thereafter, however, Dr. Ding received several unsatisfactory evaluations, and he failed his cardiac sub-specialty rotation twice. Of the 27 residents who participated in the cardiac rotation, only three failed on their first try; none but Dr. Ding failed on the second. Two of the residents who passed on their first try were of Chinese national origin.

On March 21, 2001, Dr. Ding performed an intubation that drew sharp criticism from the attending physicians, who felt that Dr. Ding's "anesthetic management of this patient was grossly inadequate." Def. Ex. 58. Further, the CCC found Dr. Ding had failed to call for assistance when he needed it, to communicate what had occurred to his attending physician, and to document adequately the basis for his medical judgment in performing the intubation. As a result of this incident, Dr. Ding was issued a letter of reprimand from the CCC on July 10, 2001. Def. Ex. 60. Although Dr. Ding appealed the reprimand, the GMEC concluded by letter of August 28, 2001 that the warning "was appropriate and justified." Def. Ex. 64. At the end of the six-month period from January to June, 2001, the CCC for a third consecutive time rated Dr. Ding's overall clinical competence as "unsatisfactory." Def. Ex. 61. Dr. Ding took sick leave from the program from September 4, 2001 to October 22, 2001.

Dr. Ding has steadfastly maintained, including in this action, that he performed the March 16, 2001 intubation properly, even according to the medical textbooks authored by the defendant attending physicians and members of the CCC. Specifically, on October 6, 2001, while he was out on leave, Dr. Ding sent an e-mail message to numerous people within the hospital, including faculty, residents, certified registered anesthetists, and student nurse anesthetists, explaining "what happened to [him]" and seeking their "judgment based on ...

fairness, equality, justice and professionalism." Def. Ex. 69. The explanation contained a detailed description of the March 16 intubation and included the patient's name, date of birth, and medical records number, along with the patient's relevant medical history.

Dr. Ding's explanation did not contain any allegation that the criticism of his intubation was because of his race. Dr. Ding had, however, filed a complaint in September 2001 with the SUNY Affirmative Action Officer in the Office of Opportunity and Diversity alleging that he was being discriminated against on the basis of his national origin.

On October 24, 2001, the Office of the University Counsel sent Dr. Ding a letter stating: "It has come to our attention that you have disclosed personal and confidential departmental case information by email ... in violation of law. You are hereby directed to immediately cease and desist from any such further disclosures." Def. Ex. 70. The letter further advised Dr. Ding that "effective immediately, you are directed not to be on the premises of the State University of New York, Health Science Center at Brooklyn .... If you are on the premises for any reason, you will be considered trespassing and subject to arrest." *Id*. The next day, Dr. Cotrell notified Dr. Ding by letter that his e-mail communication "was unprofessional and irresponsible" and left "the department with no other choice but to terminate you from the program effective immediately." Def. Ex. 71.

After Dr. Ding was terminated he received notice that his affirmative action complaint with SUNY had been denied. Dr. Ding filed a verified complaint with the EEOC on December 28, 2001, alleging he was terminated from his residency because of his national origin. On October 10, 2002 the EEOC dismissed his complaint, concluding that there was "no probable cause to believe that [Downstate] has engaged in or is engaging in the unlawful discriminatory

practice" of which Dr. Ding complained. Def. Ex. 74. Dr. Ding then filed this action, and the defendants have moved for summary judgment.[1]

DISCUSSION

SUNY and the defendant doctors in their official capacity enjoy immunity from suit under the Eleventh Amendment to the Constitution of the United States, and therefore several of Dr. Ding's claims against them must be dismissed for lack of jurisdiction. *Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990); *Garcia v. State Univ. of New York Health Science Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Pursuant to its powers under Section 5 of the Fourteenth Amendment, the Congress may abrogate the sovereign immunity of the states, and it has done so with respect to claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456-57 (1976). The Eleventh Amendment thus poses no bar to Dr. Ding's Title VII claims for invidious discrimination and retaliation.

Dr. Ding's other federal claims against SUNY, however, based upon provisions of the Civil Rights Act of 1871, including 42 U.S.C. §§ 1981 & 1983, are foreclosed by New York's state sovereign immunity, as the Congress did not evince any intent to deprive the states of their immunity in enacting those provisions. *Howlett v. Rose*, 496 U.S. 356, 365 (1990) (§ 1983); *Pikulin v. City University of New York*, 176 F.3d 598, 600-01 (2d Cir. 1999) (§ 1981).[2]

---

[1] As to defendant Dr. Giffin, defense counsel served a suggestion of death on March 15, 2005, and Dr. Ding has not filed any motion for substitution. Accordingly, the claims against Dr. Giffin are dismissed.

[2] The case law has not been as explicit concerning whether § 1985 abrogates state sovereign immunity. In any event, it is well-settled that a State and its instrumentalities are not "persons" subject to suit under § 1983, *Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir. 1998), and there is no reason to suspect the Congress intended the term "persons" to take on a different meaning in § 1985. Dr. Ding's § 1985 claim against SUNY and the defendant doctors in their official capacities is therefore dismissed.

The Congress has not attempted to abrogate states' sovereign immunity with respect to pendent claims arising under state law, *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540-41 (2002), and the State of New York has not consented to claims for damages against it in the federal courts. *See Bertoldi v. State of New York*, 712 N.Y.S. 2d 113, 115 (1st Dep't 2000) ("It is well-settled that the Court of Claims has exclusive jurisdiction over actions for money damages against the State, State agencies, [and] State officials acting in their official capacities ...."). Accordingly, all of Dr. Ding's claims against SUNY and the defendant doctors in their official capacities, except his Title VII claims, are dismissed.

Dr. Ding's Title VII claims against the defendant doctors in their individual capacities must be dismissed, however, because "individual defendants with supervisory control over a plaintiff may not be held liable under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995).

Turning then to the merits of Dr. Ding's remaining claims, under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law governing the case identifies the facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted); *see also, e.g.*, *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) ("[W]e ... view [the facts] in the light most favorable to, and draw inferences in favor of, the non-moving party ...." (internal quotation marks omitted)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586-87 (quoting Fed. R. Civ. P. 56(e)).

In order to make out a prima facie claim of invidious discrimination under Title VII, a plaintiff must establish that "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). If the plaintiff succeeds in doing so, then "a presumption arises that the employer unlawfully discriminated, and the burden shifts to the defendant to present a nondiscriminatory reason for the adverse employment action." *Id*. Once the employer articulates a nondiscriminatory explanation, "the presumption of discrimination drops out ... and the burden shifts back to the plaintiff, to prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id*. (internal citations and quotation marks omitted). The same burden-shifting framework ordinarily applies to analogous claims of intentional discrimination under §§ 1981 & 1983. *Patterson v. McLean Credit Union*, 491 U.S.

9

164, 186 (1989) (§ 1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming burden-shifting framework applies to § 1983 claims).

Though Dr. Ding's federal claims take various forms, one issue is of critical importance to the bulk of them -- whether the defendants' actions against him were motivated by an animus against persons of Chinese national origin -- and on this score, Dr. Ding has adduced no evidence at all. *See, e.g., Reeves v. Sanderson Plumbing Prod., Inc*. 530 U.S. 133, 148 (2001) (summary judgment appropriate "where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."); *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2001) ("court [must] examin[e] the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.") (internal quotation marks omitted).

The defendants hired Dr. Ding with knowledge that he was of Chinese national origin, and Dr. Ding has put forward no evidence that they developed a racial (or national origin-based) animus against him during his tenure there. As the Second Circuit has explained, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute ... an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). This is especially true in a case such as this, when the "persecution" Dr. Ding alleges began almost immediately after he started work. *Id*.

Neither does Dr. Ding advance any evidence that similarly situated residents of other races or national origins were treated more favorably. In fact, with respect to evaluations of

medical performance, during Dr. Ding's two years at Downstate, three residents of Chinese national origin were selected by the defendants for the prestigious position of Chief Resident and were offered faculty positions upon their completion of the program. With respect to the disclosure of confidential patient information that the defendants state ultimately led to Dr. Ding's discharge, Dr. Ding offers only a single email sent by Dr. Wlody to the residents requesting that the residents bring to his attention certain interesting cases they had handled, for the purpose of an education program he was planning to offer. Dr. Wlody's email contains no patient information, and in any event it was not sent for personal purposes, as was Dr. Ding's. Dr. Wlody's email thus provides no evidence that Dr. Wlody was similarly situated but treated differently.[3]

Otherwise, Dr. Ding offers only his "feeling" and "personal judgment" that "if [he] were a natural born United States citizen ... [he] would have been treated differently," Deposition of Pl. at 226-27. In the face of the extensive evidence the defendants have adduced that Dr. Ding was disciplined and ultimately discharged because of his long record of poor performance, no reasonable jury could conclude, based merely upon Dr. Ding's "feeling," that

---

[3] Although discovery in this matter has been closed for nearly a year, Dr. Ding maintains that the defendants have refused to comply with several of his requests for discovery. The time for resolving these disputes has passed. I have considered, particularly in light of the plaintiff's *pro se* status, excusing the untimeliness of his claim, but I conclude that Dr. Ding's requests are not sufficiently likely to lead to probative evidence to warrant reopening discovery. Dr. Ding merely points out that other doctors had patients who died (presumably he means because of errors in anesthesia), in the hope of establishing that his March 16 intubation incident, which the patient survived, was blown out of proportion by the attending physicians because of a discriminatory animus. Although "a plaintiff is not obligated to show disparate treatment of an identically situated employee," *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001), there must be a "reasonably close resemblance of facts and circumstances" such that the plaintiff and those with whom he compares himself are "similar in significant respects." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir.2001). Apart from the intubation incident, Dr. Ding received three consecutive six-month evaluations of "unsatisfactory" and widely distributed confidential patient information for personal reasons. Thus, even assuming (as Dr. Ding does) that the other doctors committed medical errors resulting in patient death, they will still not be similar in significant respects to Dr. Ding.

the actions taken by the defendants against him were actually motivated by an invidious prejudice against persons of Chinese origin. The defendants are therefore entitled to summary judgment on Dr. Ding's claims of invidious discrimination and a hostile work environment.

Dr. Ding's retaliation claims fare no better. Although his termination came close in time after he engaged in protected activity, Dr. Ding has not alleged or offered any evidence to prove that Dr. Cotrell had knowledge of Dr. Ding's affirmative action complaint at the time he decided to terminate Dr. Ding's residency, and Dr. Cotrell, by affidavit, has stated that he had no such knowledge. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000) ("plaintiff claiming retaliation must prove: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action.") Accordingly, Dr. Ding has failed to produce sufficient evidence to prove an essential element of his retaliation claims.

Finally, Dr. Ding's claim under the Due Process clause fails because, even assuming he had a cognizable liberty interest in his residency, Dr. Ding did not avail himself of adequate post-deprivation remedies available under state law. *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998); *Johnson v. Nyack Hospital*, 964 F.2d 116, 120-21 (1992) ("Under New York law .... [a] physician who wants his privileges restored must first file a complaint with the New York Public Health Council ("PHC") prior to seeking redress in the courts.").

I have reviewed Dr. Ding's state law claims, and several of them may be disposed of here in summary fashion. First, Dr. Ding's claims alleging intentional infliction of emotional distress and prima facie tort are barred by the one-year statute of limitations for intentional torts.

*Havell v. Islam*, 739 N.Y.S.2d 371, 372 (1st Dep't 2002). Where "a reading of the factual allegations discloses that the essence of the cause of action is an intentional tort, plaintiff cannot avoid a Statute of Limitations bar by labeling the action as one to recover damages for a prima facie tort." *Id*. Dr. Ding's allegation of prima facie tort plainly states in paragraph 58 that the defendants acted "for the sole purpose of harming me." Second, as explained above, Dr. Ding cannot bring a breach of contract action against SUNY, which enjoys Eleventh Amendment immunity. Neither can he bring a breach of contract action against the defendant doctors in their individual capacity, as Dr. Ding had no contract with them individually.

I express no view as to the merits of Dr. Ding's claims of tortious interference with contract and with prospective business relationships. Having dismissed all of Dr. Ding's federal claims, I decline to exercise supplemental jurisdiction over these claims, which arise under the law of New York and as to which there is no independent basis of federal jurisdiction. Pursuant to 28 U.S.C. § 1367(c)(3), they are accordingly dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the defendants motion for summary judgment is granted except as to Dr. Ding's tortious interference claims.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
      March 23, 2006